## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JUSTIN OWENS,                          Case No. 1:14-cv-554
      Plaintiff,                    Beckwith, J.
                                        Litkovitz, M.J.
     vs.

COMMISSIONER OF              **REPORT AND**
SOCIAL SECURITY,            **RECOMMENDATION**
      Defendant.

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 11) and the Commissioner's response in opposition (Doc. 14).

### I. Procedural Background

Plaintiff filed an application for SSI in November 2010, alleging disability since June 1, 2008, due to lazy eye, learning disability, attention-deficit hyperactivity disorder (ADHD), mental illness, and depression. (Tr. 174-75, 207). The application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge (ALJ) Mary F. Withum. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On February 14, 2013, the ALJ issued a decision denying plaintiff's SSI application. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 416.920(a)(4)(i)-(v), 416.920(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir.

2004).   Once the claimant establishes a prima facie case by showing an inability to perform the

relevant previous employment, the burden shifts to the Commissioner to show that the claimant

can perform other substantial gainful employment and that such employment exists in the

national economy.   *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir.

1999).

### B.    The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] has not engaged in substantial gainful activity since November
> 17, 2010, the application date (20 CFR 416.971 *et seq.*).
>
> 2. The [plaintiff] has the following severe impairment: borderline intellectual
> functioning (20 CFR 416.920(c)).
>
> 3. The [plaintiff] does not have an impairment or combination of impairments that
> meets or medically equals the severity of one of the listed impairments in 20
> C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and
> 416.926).
>
> 4. After careful consideration of the entire record, the [ALJ] find[s] that the
> [plaintiff] has the residual functional capacity to perform a full range of work at
> all exertional levels but with the following nonexertional limitations: the
> [plaintiff]'s work is limited to simple, routine, and repetitive tasks that can be
> learned by demonstration only.
>
> 5. The [plaintiff] is unable to perform any past relevant work[1] (20 CFR 416.965).
>
> 6. The [plaintiff] was born [in] . . . 1984 and was 26 years old, which is defined as
> a younger individual age 18-49, on the date the application was filed (20 CFR
> 416.963).
>
> 7. The [plaintiff] has a limited education and is able to communicate in English
> (20 CFR 416.964).

---

[1]Plaintiff has past relevant work as a janitor and day laborer.   (Tr. 44).

3

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is 'not disabled,' whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 416.969 and 416.969(a)).[2]

10. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since November 17, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14-23).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).   In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

---

[2]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform 62,000 heavy, unskilled jobs in the regional economy, such as commercial cleaner, landscape laborer, and bakery helper.   (Tr. 22-23, 45).

4

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.   Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D.  Specific Errors**

On appeal, plaintiff argues that: (1) the ALJ erred in failing to find that plaintiff's loss of visual acuity was a severe impairment and by not including visual limitations in assessing his residual functional capacity (RFC); (2) the ALJ erred in giving "great weight" to the opinion of the consultative examining psychologist, Nancy Schmidtgoessling, Ph.D.; and (3) the ALJ erred in finding that plaintiff's intellectual impairments did not meet or medically equal Listing 12.05. (Doc. 11).   Plaintiff's arguments will be addressed in turn.

1. <u>Whether the ALJ erred in determining that plaintiff's vision impairment was not severe</u>.

For his first assignment of error, plaintiff asserts the ALJ erred in determining that he did not have a severe vision impairment and by failing to include any visual limitations in formulating his RFC.   Plaintiff argues that the ALJ ignored pertinent evidence and created her own medical opinion in finding that his visual impairment was non-severe.   Plaintiff also maintains that the ALJ's failure to formulate an accommodating RFC leaves her decision without substantial support

because the medical evidence of record establishes that he suffers from visual acuity deficiencies that cause significant limitations. (Doc. 11 at 8-12).

The following is a summary of the medical evidence in the record pertaining to plaintiff's vision impairment. A December 8, 1992 visual examination conducted pursuant to plaintiff's grade school Individualized Education Program (IEP) revealed that plaintiff had 20/100 vision in his right eye and 20/25 vision in his left while wearing bifocal glasses. (Tr. 256). It was therefore recommended that plaintiff be given preferential seating in class. (Tr. 254).

In October 2010, plaintiff sought treatment at the emergency room for neck pain. (Tr. 500-09). The examining physician's assistant noted that plaintiff exhibited "right mild convergent strabismus[3]," which plaintiff reported was "chronic and baseline." (Tr. 501).

Plaintiff was examined by consultative examining ophthalmologist Edward R. Thomas, M.D., on March 7, 2011. (Tr. 539-42). Plaintiff was unable to read any letters on the Snellen chart[4] from any distance with his right eye, but was able to count fingers.[5] (Tr. 539). Plaintiff's left eye vision was 20/30 with best correction. (Id.). Plaintiff was diagnosed with amblyopia[6] in his right eye and hyperopia (farsightedness) and astigmatism in his left eye. (Tr. 540).

---

[3]"Strabismus is a disorder in which both eyes do not line up in the same direction, so they do not look at the same object at the same time. The condition is more commonly known as 'crossed eyes.'" See https://www.nlm.nih.gov/medlineplus/ency/article/001004.htm (last visited April 20, 2015).

[4]The Snellen chart is a standardized chart containing letters of different sizes that is used to assess visual acuity. See https://www.nlm.nih.gov/medlineplus/ency/article/003396.htm (last visited April 23, 2015).

[5]"When the patient cannot read the largest line of print on an acuity chart at the accustomed distance, he can be slowly moved toward the chart until the largest letter can be read. The numerator of the Snellen fraction becomes the shortened distance (e.g., 10 feet) and the denominator refers to the smallest letter read on the chart (i.e., the 20/400 'E'). If no letters can be read at any distance, the examiner then asks the patient to count fingers at progressively shorter distances until this task can be reliably performed and the distance is recorded (e.g., 'counts fingers at 3 feet'). If finger counting is not possible, one checks for the perception of hand motions, then light perception with accurate localization, light perception with localization, and finally, no light perception." Morgan v. Colvin, No. 12-00204-B, 2013 WL 5445690, at *3 n.4 (S.D. Ala. Sept. 30, 2013) (citing http://www.ncbi.nlm.nih.gov/books /NBK219/ (Last visited: August 28, 2013)).

[6]"Amblyopia is the medical term used when the vision in one of the eyes is reduced because the eye and the brain are not working together properly. The eye itself looks normal, but it is not being used normally because the

6

Ali Shadchehr, M.D., a state agency reviewing physician, reviewed the medical record in March 2011 and opined that plaintiff should not work around unprotected heights or dangerous machinery or engage in commercial driving due to his visual limitations. (Tr. 50-58). In June 2011, state agency reviewing physician Maria Congbalay, M.D., affirmed Dr. Shadchehr's opinion. (Tr. 60-69).

The ALJ noted that plaintiff has reduced vision in his left eye and an amblyopic right eye, but found that because plaintiff "still has good vision in his left eye and functional vision in his right eye, [plaintiff]'s eye impairment will not more than minimally impact his ability to work and is not severe." (Tr. 14-15). The ALJ acknowledged that Drs. Shadchehr and Congbalay opined that plaintiff was limited by his vision but determined that this portion of their opinions was entitled to "little to no weight" because it was not supported by the record evidence. (Tr. 21). In support of this finding, the ALJ provided "[w]hen [plaintiff]'s right eye vision was measured previously, it was still at 20/100 ([Tr. 254-57]). Also, [plaintiff]'s left eye is corrected to 20/30 ([Tr. 539-43])." (Tr. 21).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 416.920(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions like walking, standing, lifting, and carrying; the capacity for seeing and hearing; and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. § 416.921(b).

---

brain is favoring the other eye. This condition is also sometimes called lazy eye." *See* https://www.nei.nih.gov /health/amblyopia (last visited April 20, 2015).

Plaintiff is not required to establish total disability at this level of the sequential

evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff

must prove in order to establish disability within the meaning of the Act. *Gist v. Sec'y of H.H.S.,*

736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered nonsevere only if it is a

"slight abnormality which has such minimal effect on the individual that it would not be expected

to interfere with the individual's ability to work, irrespective of age, education, and work

experience." *Farris v. Sec'y of H.H.S.,* 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler,*

724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a *"de minimis* hurdle" in the

sequential evaluation process. *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1988). *See also*

*Rogers*, 486 F.3d at 243 n.2.

The ALJ's determination that plaintiff does not have a severe vision impairment is not

supported by substantial evidence. The objective medical evidence from 2011 establishes that

plaintiff suffers from amblyopia in his right eye and was only able to "count fingers" on visual

acuity testing of the right eye "with a restricted field of vision." (Tr. 56, 67, 539). Based on this

evidence, the state agency physicians both concluded that plaintiff's "loss of visual efficiency"

constituted a severe impairment and limited plaintiff to work not involving unprotected heights,

dangerous machinery, or commercial driving. *See* Tr. 55-56, 66-67. The ALJ rejected these

opinions based on her conclusion that plaintiff had good vision in his left eye and "functional"

vision in his right eye, citing to Dr. Thomas's 2011 testing showing left eye vision of 20/30 with

correction and tests from 1992 showing right eye vision of 20/100. The ALJ's conclusion

ignores Dr. Thomas's 2011 testing of plaintiff's right eye which showed that the vision in

plaintiff's right eye decreased to worse than 20/400 because he was able to only "count fingers."

8

*See Morgan*, 2013 WL 5445690, at *3 n.4. The 20/100 right eye measurement relied on by the ALJ occurred 19 years before Dr. Thomas's 2011 examination, and there is no medical or other opinion evidence in the record that supports the ALJ's conclusion that plaintiff's vision impairment does not have more than a minimal effect on plaintiff that it would not be expected to interfere with his ability to work. *Farris,* 773 F.2d at 90. The ALJ's decision to reject the state agency doctors' opinions is based solely on her impermissible "medical" opinion. "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (internal quotations omitted). This is precisely what the ALJ did in this case. Despite the consistent medical opinions of Drs. Shadchehr and Congbalay that plaintiff's vision impairment limits his ability to perform work-related activities, the ALJ unilaterally determined that the objective medical evidence did not support these opinions. The record as a whole supports the conclusion that plaintiff's visual impairment is more than a "slight abnormality" having more than a "minimal effect" on his work capabilities. *Farris*, 773 F.2d at 90. The Court therefore concludes that the ALJ erred by impermissibly relying on her own lay "medical" opinion in concluding that plaintiff's vision impairment is not severe.[7]

Moreover, the ALJ's error was not harmless. While the VE testified at the ALJ hearing that plaintiff would be able to perform work as a commercial cleaner, landscape laborer, and

---

[7]The Commissioner's argument that this error is harmless under *Maziarz v. Sec'y of H.H.S.*, 837 F.2d 240, 244 (6th Cir. 1987) is not well-taken. *See* Doc. 14 at 6-8. *Maziarz* stands for the proposition that where the ALJ finds at least one severe impairment, continues with the sequential evaluation process, and considers the limitations from additional impairments in formulating a plaintiff's RFC, any error in classifying the additional impairments as "non-severe" is harmless. *Id.* at 244. Here, however, the ALJ explicitly rejected the state agency physicians' opinions on plaintiff's visual impairment and declined to include their recommended limitations in formulating the RFC. Thus, *Maziarz* is inapt.

bakery helper if plaintiff were limited to frequent near and far acuity and frequent depth

perception, *see* Tr. 45, the ALJ did not question the VE about whether plaintiff would still be able

to perform this work if he were unable to work around unprotected heights or dangerous

machinery or engage in commercial driving due to his visual limitations as determined by the state

agency physicians.   This matter should therefore be remanded with instructions to the ALJ to

reassess the severity of plaintiff's visual impairment consistent with the Social Security

regulations and this opinion and reformulate plaintiff's RFC as necessary.

2. Whether the ALJ erred in giving "great weight" to the consultative examining
psychologist's opinion.

"The Commissioner has elected to impose certain standards on the treatment of medical

source evidence."   *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).   "These standards, set forth

in administrative regulations, describe (1) the various types of evidence that the Commissioner

will consider, 20 C.F.R. § 404.1512; (2) who can provide evidence to establish an impairment, 20

C.F.R. § 404.1513; and (3) how that evidence will be evaluated, 20 C.F.R. § 404.1520b."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).   This evidence may include

"medical opinions, which 'are statements from physicians and psychologists . . . that reflect

judgments about the nature and severity of [a claimant's] impairment(s), including [ ] symptoms,

diagnosis and prognosis,' physical and mental restrictions, and what the claimant can still do

despite his or her impairments."   *Id.*, (citing 20 C.F.R. 404.1527(a)(2)).

The applicable regulations lay out the three types of acceptable medical sources upon

which an ALJ may rely on: treating source, nontreating source, and nonexamining source.   20

CFR § 416.902.   When treating sources offer opinions, the Social Security Administration is to

give such opinions the most weight and is procedurally required to "give good reason in [its]

notice of determination or decision for the weight [it gives the claimant's] treating source's

opinion." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d at 875.  This requirement only applies to

treating sources.  *Id.* at 876.  "With regard to nontreating, but examining, sources, the agency

will simply generally give more weight to the opinion of a source who has examined the claimant

than to the opinion of a source who has not examined him."  *Ealy v. Comm'r of Soc. Sec.*, 594

F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1)) (internal citations omitted).

Plaintiff was examined by consultative examiner Nancy Schmidtgoessling, Ph.D., on

February 18, 2011.  (Tr. 531-36).  Dr. Schmidtgoessling reported:

> [Plaintiff] appeared to be malingering during the evaluation.  He was
> uncooperative.  He had what appeared to be unlikely memory gaps.  He had poor
> effort and persistence.  He indicated he could not understand even simple
> direction, such as 'repeat these words.'  He said 'don't know,' made sarcastic
> comments or just shrugged when asked questions.

(Tr. 531).  On mental status examination, Dr. Schmidtgoessling observed that plaintiff's

comments were logical, relevant and coherent; he was able to sustain conversation; his comments

were goal directed; and his associations were tight.  (Tr. 533).  Plaintiff did not appear depressed

and did not exhibit signs of anxiety or nervousness during the evaluation.  (*Id.*).  With respect to

sensorium and cognitive functioning, Dr. Schmidtgoessling reported that plaintiff was alert and

responsive but not very cooperative.  (Tr. 534).  Plaintiff provided an incorrect date and year and

was able to remember one of three words immediately, but remembered all three on the second try

though he remembered none after a five minute delay.  (*Id.*).  Plaintiff was unable to do serial

threes even with demonstration or count items in front of him and Dr. Schmidtgoessling reported

that his fund of knowledge and judgment in hypothetical situations were in the retarded range.

(*Id.*).  Plaintiff appeared to be functioning in the borderline range of intelligence in conversation which Dr. Schmidtgoessling said was inconsistent with the full scale IQ of 48 he obtained on intelligence testing.  (*Id.*).  Dr. Schmidtgoessling reported that plaintiff had poor effort and persistence on testing but had no apparent difficulty understanding or following directions.  She found that his scores were an underestimate of his abilities.  (Tr. 535).  Dr. Schmidtgoessling opined that plaintiff is not impaired in his ability to understand, remember and follow instructions based upon the results of the evaluation.  (Tr. 535).  She noted that plaintiff was able to understand and follow directions throughout IQ testing.  (*Id.*).  Dr. Schmidtgoessling could not estimate plaintiff's ability to maintain attention and concentration, persistence and pace due to what appeared to be malingering on testing.  (*Id.*).  She also could not estimate plaintiff's ability to relate to others or tolerate the normal stress and pressures of day-to-day work activity because plaintiff did not provide sufficient information.  (*Id.*).  Dr. Schmidtgoessling diagnosed plaintiff with learning disorder NOS and disruptive behavior disorder NOS.  (*Id.*).

The ALJ gave "great weight" to Dr. Schmidtgoessling's opinion because: (1) she "is an acceptable, independent medical source who conducted a thorough examination of [plaintiff]"; (2) "[h]er findings are consistent with [plaintiff]'s school records that show that [plaintiff] performed well when he showed high effort and performed poorly when he showed low effort"; and (3) "[h]er findings are also consistent with her examination of [plaintiff] where [plaintiff] had no problem understanding and following directions, yet performed very poorly on the I.Q. test."  (Tr. 20).

Plaintiff asserts the ALJ erred in giving "great weight" to Dr. Schmidtgoessling's opinion because the record as a whole establishes that he was not malingering during the consultative

examination; rather, plaintiff argues his cognitive delays and turbulent childhood[8] explain his

"unlikely memory gaps" and diminished ability to put forth better effort on testing as observed by

Dr. Schmidtgoessling.  *See* Tr. 531.  Plaintiff argues that Dr. Schmidtgoessling did not have the

opportunity to review all of his school records, and if she had she would have understood that his

inability to recall the details of his childhood and education is valid.  Plaintiff further argues that

Dr. Schmidtgoessling's finding that plaintiff has no limitation in understanding directions lacks

support as the record establishes that he has had difficulty following directions since the second

grade, as evidenced by his inability to do serial threes even with demonstration.  *See* Tr. 238, 286,

534.  Plaintiff further criticizes the ALJ's reliance on Dr. Schmidtgoessling's opinion because

although the doctor stated that plaintiff "did not have apparent difficulty understanding or

following directions" on intelligence testing (Tr. 535), the doctor did not administer the test and,

consequently, her opinion in this respect is unreliable.  (Doc. 11 at 12-19).

The ALJ's decision giving "great weight" to Dr. Schmidtgoessling's opinion is supported

by substantial evidence.  First, Dr. Schmidtgoessling's determination that plaintiff was

malingering and gave poor effort at the consultative examination is supported by the evidence of

record.  Plaintiff's performance on cognitive functioning testing was inconsistent, as plaintiff

"indicated he could only remember one of three words immediately but on the second try he

recalled three of three words."  (Tr. 534).  Plaintiff's performance on testing was also

inconsistent with his abilities as reflected in his educational records.  For example, although

plaintiff claimed he could not do serial threes or count items in front of him at the consultative

---

[8]Plaintiff attended multiple schools throughout his childhood and was briefly incarcerated at the Cuyahoga
Hills Juvenile Correctional Facility.  *See* Tr. 227, 233-34, 254-57, 401-452.  Further, plaintiff had traumatic
experiences with his biological mother; his aunt became his legal guardian for a period; and he spent time living in a
foster home.  *See* Tr. 257, 549.

examination (Tr. 534), a 2001 evaluation shows that he could do basic addition and subtraction

(Tr. 316); he earned a 72/100 in Math in the 1999-2000 school year with home instruction (Tr.

369); 1997 testing shows that plaintiff was able to add and subtract at a late second grade level,

though he did not know multiplication facts (Tr. 574-75); and 2001 and 2002 records show that

plaintiff consistently achieved passing to high grades in Math.  (Tr. 402, 410-12).  Plaintiff also

tested significantly lower on IQ testing with Dr. Schmidtgoessling than on previously

administered tests.  *See* Tr. 255 (in 1992, plaintiff tested in the borderline range of intelligence

with a full scale IQ of 79, a verbal IQ of 79, and a performance IQ of 82); Tr. 576 (in 1997,

plaintiff scored a full scale IQ of 69, a verbal IQ of 64, and a performance IQ of 78); Tr. 535 (at

the 2011 consultative examination, plaintiff scored a full scale IQ of 48).  The disparity between

plaintiff's performance at the consultative examination and his abilities as reflected in the

educational records substantially supports the ALJ's reliance on Dr. Schmidtgoessling's

conclusion that plaintiff was malingering at the examination.

Second, Dr. Schmidtgoessling's finding of malingering was not based solely on plaintiff's

examination performance.  The doctor reported that plaintiff was uncooperative throughout the

examination; "[h]e said 'don't know,' made sarcastic comments or just shrugged when asked

questions"; and he was vague and guarded.  (Tr. 531, 533).[9]  Moreover, plaintiff told Dr.

Schmidtgoessling that "he could not understand even simple directions, such as 'repeat these

words'" (Tr. 531), which is inconsistent with the educational records showing that plaintiff was

able to follow one step directions.  *See* Tr. 287, 317.  Given the record evidence as a whole and

---

[9]The Court notes that this presentation is consistent with plaintiff's presentation at the ALJ hearing where plaintiff was repeatedly reminded to speak up or speak into the microphone; he claimed he was unable to use a cellular phone and that in the case of an emergency he would "just die"; and he was observed as smirking.  *See* Tr. 32-43.

14

the fact that Dr. Schmidtgoessling had the opportunity to personally examine and evaluate plaintiff, it was reasonable for the ALJ to rely on and give "great weight" to the doctor's conclusion that plaintiff was malingering during his examination.

Insofar as plaintiff maintains that Dr. Schmidtgoessling would have come to a different conclusion had she had the opportunity to review all of his educational records, the Court is not persuaded.   While these records indeed illustrate that plaintiff had a "turbulent" childhood such that his inability to provide an accurate and detailed history might be understandable, the doctor's finding was not based solely on plaintiff's apparent "unlikely memory gaps."  (Tr. 531).   Rather, based upon plaintiff's overall presentation at the examination, Dr. Schmidtgoessling observed that plaintiff was unresponsive and uncooperative, he provided sarcastic or non-verbal responses, and he put forth minimal effort.   These observations amply support her conclusion of malingering.

Third, contrary to plaintiff's assertion, the fact that Dr. Schmidtgoessling's aide administered the IQ test to plaintiff does not invalidate the doctor's finding that plaintiff did not have apparent difficulty understanding or following directions.  *See* Tr. 531, 535.   There is nothing in the record to indicate that the aide reported that plaintiff was unable to understand or follow directions nor is there any basis to believe that Dr. Schmidtgoessling improperly generated this finding.   It is a common practice for doctors to rely upon the results of tests administered by their assistants and nurses in forming their medical opinions; therefore, it was not improper for Dr. Schmidtgoessling to rely on the reports of her aide in formulating her opinion.

In any event, despite Dr. Schmidtgoessling's opinion that plaintiff is not impaired in his ability to understand, remember, and follow instructions (Tr. 535), the ALJ nevertheless limited plaintiff to "simple, routine, and repetitive tasks that can be learned by demonstration only."  (Tr.

15

18).   This limitation is substantially supported by plaintiff's educational records which show he is

capable of following simple directions.  *See* Tr. 287, 317.  *See also* Tr. 548-49 (in January 1998,

plaintiff was evaluated and it was reported that following direction was a strength and that he was

able to learn by using a tactual approach and following concrete, step-by-step directions).

Plaintiff has not cited to any other opinion evidence from any medical or other source

that contradicts Dr. Schmidtgoessling's conclusions or establishes he suffers from limitations not

accommodated by the ALJ's RFC formulation.   Accordingly, the ALJ's decision to give "great

weight" to Dr. Schmidtgoessling's opinion is substantially supported by the record and plaintiff's

second assignment of error should be overruled.

3. Whether the ALJ erred in finding plaintiff's mental impairments did not meet or
   medically equal Listing 12.05.

Listing 12.05 provides in pertinent part:

**Intellectual disability**: intellectual disability refers to significantly subaverage
general intellectual functioning with deficits in adaptive functioning initially
manifested during the developmental period, i.e., the evidence demonstrates or
supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A,
B, C, or D are satisfied.
 . . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or
other mental impairment imposing an additional and significant work-related
limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at
least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C, D.

A claimant will meet Listing 12.05 for intellectual disability "only '[i]f [her] impairment satisfies the diagnostic description in the introductory paragraph" and the criteria of subsection C or D. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A)). Accordingly, to satisfy Listing 12.05C, plaintiff must show (1) "significantly subaverage general intellectual functioning;" (2) "deficits in adaptive functioning" which initially manifested during the developmental period (i.e., before age 22); (3) a valid IQ score between 60 through 70; and (4) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Daniels v. Comm'r*, 70 F. App'x 868, 872 (6th Cir. 2003). To satisfy Listing 12.05D, plaintiff "must establish manifestation of deficits in adaptive functioning prior to the age of 22, a valid I.Q. of 60 through 70, and at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of an extended duration." *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 460 n.1 (6th Cir. 2012) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05D).

"*Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV, p. 42.

17

"Adaptive functioning" includes the plaintiff's "effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). Mental retardation requires concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. DSM-IV, p. 49.

Plaintiff claims the ALJ erred by finding he did not meet the criteria of Listings 12.05C and 12.05D. (Doc. 11 at 19-23). Regarding Listing 12.05C, plaintiff contends the ALJ erred when he rejected plaintiff's 1997 full scale IQ score of 69 based on Dr. Schmidtgoessling's 2011 determination that plaintiff malingered on testing. (*Id.* at 20-22, citing Tr. 17). Plaintiff alleges he meets Listing 12.05D because the IQ score of 69 should be deemed valid and he has at least a marked degree of restriction in activities of daily living, social functioning, and maintaining concentration, persistence or pace. (*Id.* at 23). In support, plaintiff cites to his ALJ hearing testimony and his statements to Dr. Schmidtgoessling that, *inter alia*, he has never lived alone, he has no friends and engages in no social activities, and he does no housework. (*Id.*, citing Tr. 32-43, 43, 532, 534).

Plaintiff's third assignment of error should be overruled because there is substantial evidence to support the ALJ's conclusion that plaintiff does not meet each of the criteria of Listings 12.05C or 12.05D. Even if plaintiff is correct in alleging the ALJ erred by disregarding the 1997 IQ score of 69 based on Dr. Schmidtgoessling's observations of malingering during plaintiff's 2011 consultative examination, this would be harmless error because this IQ score is

not valid for purposes of meeting a listed impairment.   The Social Security regulations indicate

that IQ testing results generally do not stabilize until the age of 16, and scores obtained between

the ages of 7 and 16 are considered current for two years when the IQ score is 40 or above.  *See*

20 C.F.R., Part 404, Subpart P, Appendix 1, § 112.00(D)(10).[10]   The Social Security

Administration's Program Operations Manual System (POMS) § DI 24515.055,[11] provides that

"[t]est results obtained at younger ages are less reliable and valid than test results obtained at

older ages."   POMS § DI 24515.055(A).   The POMS state that IQ scores obtained at age 7 up to

age 16 should be considered current for two years, while "[i]ntelligence test results obtained at

age 16 or older may be assumed to apply to the subject's current status provided they are

compatible with the individual's current behavior."   POMS § DI 24515.055(D).

Plaintiff's full scale IQ score of 69 was obtained during a November 12, 1997 assessment

when he was 13 years old.  *See* Tr. 576.   (Tr. 553).   While plaintiff relies on the 1997 IQ score

to argue he meets Listing 12.05C, this test was administered before the age of 16 and is no longer

considered valid for purposes of the Listings.  *See Pollard v. Comm'r of Soc. Sec.*, No.

1:10-cv-714, 2012 WL 95426, at *4 (S.D. Ohio Jan. 12, 2012) (citing 20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 112.00(D); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125-26 (6th

Cir. 2003)).   Consequently, plaintiff does not have a valid IQ score for purposes of meeting

Listing 12.05.[12]

---

[10]Listing 112.05 pertains to children's intellectual disability.  *See* 20 C.F.R. § 404, Subpart P, Appendix 1, § 112.00.

[11]The POMS is the operational reference used by the Social Security Administration staff to conduct daily business.   "While these administrative interpretations [POMS] are not products of formal rulemaking, they nevertheless warrant respect."  *Washington Dep't of Soc. Servs. v. Keffeler*, 537 U.S. 371, 385 (2003).   The POMS is available at https://secure.ssa.gov/poms.nsf/ home!readform (last visited April 22, 2015).

[12]  The Court notes that when plaintiff was 8 years old, intelligence testing yielded a verbal score of 79, a

It is well established that a claimant must show that he satisfies all the individual requirements of a listing.  *See Sullivan v. Zebley,* 493 U.S. 521, 530-32 (1990); *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986) (at Step 3, a claimant's impairment must meet every element of a listing before the Commissioner may conclude that he is disabled). An impairment that satisfies only some of the elements of a particular Listing, "no matter how severely, does not qualify."  *Zebley,* 493 U.S. at 530.   Here, there is substantial evidence supporting the ALJ's decision that plaintiff's intellectual functioning did not meet the requisite criteria of Listings 12.05C and 12.05D.   Therefore, plaintiff's third assignment of error should be overruled.

## III.  Conclusion

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation.   All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits.  *Faucher v. Sec'y of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). On remand, the ALJ should, consistent with this opinion, reassess the severity of plaintiff's vision impairment and reformulate plaintiff's RFC as necessary.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and **REMANDED** for further

---

performance score of 82, and a full scale score of 79, and plaintiff was determined to function in the borderline range of intelligence.   (Tr. 255-56).   These scores exceed the requirements of Listing 12.05C and are also too old to be valid.

proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: ___5/4/15___

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JUSTIN OWENS,
    Plaintiff,

Case No. 1:14-cv-554

Beckwith, J.
Litkovitz, M.J.

   vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.   Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.   If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.   A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.   Failure to make objections in accordance with this procedure may forfeit rights on appeal.   *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

22